IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MICHAEL F. SHORT, as TRUSTEE of the MICHAEL F. SHORT LIVING TRUST, and SHORT FR, LTD., a Texas limited partnership, | CV 19-31-BLG-TJC |
| Plaintiffs, | **ORDER** |
| vs. | |
| PARK ELECTRIC COOPERATIVE, INC., and ARTHUN RANCH, INC., | |
| Defendants. | |

Plaintiffs Michael F. Short, as Trustee of the Michael F. Short Living Trust, and Short FR, LTD., a Texas limited partnership, (collectively, "Short"), bring this action against Defendants Park Electric Cooperative, Inc. ("PEC"), and Arthun Ranch, Inc. ("Arthun"), alleging various causes of action related to the provision of electrical service on Short's property and easements for electrical distribution lines. (*See generally* Doc. 1.)

Before the Court are PEC's Motion for Summary Judgment (Doc. 39), Arthun's Motion for Summary Judgment (Doc. 43), and Short's Motion for Partial Summary Judgment (Doc. 45). The motions are fully briefed and ripe for the Court's review. Having reviewed the parties' submissions, the Court finds that

Arthun and PEC's motions should be **GRANTED**, and Short's motion should be **DENIED**.

## I.     Factual Background[1]

In 2015, Short purchased two sections of real estate in Meagher County, Montana ("Short property"), with the intent to build a recreational/vacation residence.  Arthun is a family ranch in Meagher County, which operates on two sections of land located to the south of the Short property.  PEC is a Montana rural electrical cooperative, which provides electrical service to its members in Meagher, Park, Gallatin, and Sweet Grass Counties, including the Arthun property.

The Short and Arthun properties are separated by a section of land owned by the State of Montana (state section).  Hence, the state section is sandwiched between the Short property on its northern border, and the Arthun property on its southern boundary.

At the time Short purchased its property, there was no electrical service to the property, and Short did not explore the availability of electrical access before the purchase.  After purchasing the property, however, Short sought to establish electrical service.

---

[1] The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment, are taken from the parties' submissions, and are undisputed unless otherwise indicated.

Short has an easement over the state section which would allow the placement of electrical distribution lines from the Arthun/state section border to Short's property.  The Arthun property is also encumbered by easements in favor of both PEC and the Short property, described below.

First, in 1956, Arthun's predecessor in interest granted a right-of-way easement across the Arthun property to PEC ("1956 Easement").  The 1956 Easement gave PEC "the right to enter [the Arthun property] . . . to place, construct, operate, repair, maintain, relocate and replace . . . an electric transmission or distribution line or system."  (Doc. 26-1.)  After obtaining the easement, PEC constructed an electrical distribution line on the Arthun property, which provides electricity to the Arthun's residence and outbuildings.  The line generally runs in a northerly direction the length of the Arthun property and terminates near the Arthun's residence.

A second easement was granted by Arthun in June 1989 to the Short's predecessors, Gordon Bright and Karen Bright Windecker ("Brights").  For years, Arthun had permitted the Brights to access the Short property via an existing roadway which runs north through the Arthun property to the state section.  In 1989, the Brights requested a written easement in contemplation of the sale of the Short property.  Arthun granted the Brights a roadway easement for ingress and egress that was "limited to agricultural endeavors only."  (Doc. 26-2.)

3

This easement was expanded beyond agricultural use in August 1989 to allow "for purposes ordinarily and reasonably associated with the ownership and use of . . . lands including, . . . the installation of utility lines and cables." (Doc. 26-3.) The location of the easement was not changed.

The 1989 easement erroneously referred to the Short property as the "servient" lands. This scrivener's error was corrected to the "dominant" lands in 2008 ("2008 Easement"). (Doc. 26-4.) The 2008 Easement was otherwise unchanged, and it explicitly superseded the August 1989 easement. (*Id.*)

The 2008 Easement runs generally north and south across the Arthun property along an existing road, at least a portion of which was a county road known as the Anderson Road. The Anderson Road has a Y-shaped fork south of the Arthun/state section border. One branch of the "Y" continues north for approximately 175 yards before entering the state section. This is the branch of the road used by the Brights to access the state section and the Short property. The other branch of the "Y" diverts to the west and proceeds to the residence and outbuildings on the Arthun property. The 2008 Easement along the Anderson Road is east of, and roughly parallels, the existing distribution line on the Arthun property.

4

After purchasing the property, Short requested that Arthun allow Short to connect to the electrical line on the Arthun property to bring electrical service to the Short property.  Arthun ultimately denied the request.

Short then contacted PEC about obtaining electrical service.  Short requested that PEC extend the existing electrical line which services the Arthun property to the border of the Arthun/state section.  PEC, in turn, contacted Arthun twice, but was advised on both occasions that Arthun would not grant an easement to connect to the line on the Arthun property.  PEC thus informed Short of two options: either (1) obtain an easement from Arthun to connect to the line on Arthun's property; or (2) construct a line along the Anderson road to the state section via the existing 2008 Easement.  Short has declined the latter option, and asserts that it already has the right to establish electrical service through the 1956 and 2008 Easements on the Arthun property.

On March 28, 2019, Short filed suit against PEC and Arthun alleging various causes of action related to the 1956 and 2008 Easements.  (Doc. 1.) Following this Court's March 16, 2020, Order on the Defendants' motions to dismiss, Short's remaining claims are for declaratory judgment on easement rights (Counts 1 and 2); obstruction of, interference with, and breach of easement (Count 3); and violation of the Montana Consumer Protection Act as to PEC (Count 7). (Doc. 22).

5

PEC and Arthun have both filed motions for summary judgment as to all of Short's claims.  Short has also filed a motion for partial summary judgment on Counts 1 and 2 of its Complaint.

## II.   Legal Standard

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party.  *Id*.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the non-moving party's evidence.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually

exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and . . . by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party.  *See Matsushita*, 475 U.S. at 587.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."  *Anderson*, 477 U.S. at 255.

## III.    Discussion

PEC moves for summary judgment on all of Short's remaining claims. (Doc. 39.)  PEC first argues that it is entitled to summary judgment on Count 1, for

declaratory judgment as to the 2008 Easement, because Count 1 only states a claim against Arthun, not PEC.[2]  (Docs. 1 at ¶¶ 41-44; 40 at 9-10.)  As to Count 2, PEC asserts that the 1956 Easement does not grant it the right to extend electric service from Arthun's property to Short.  (Doc. 40 at 10-16.)  With respect to Count 3, PEC argues it did not obstruct, interfere with, or breach either easement because PEC has no right to extend electric service to Short under the 1956 Easement and has not interfered with Short's rights under the 2008 Easement.  (*Id.* at 19, 22-23.) Last, PEC contends it is entitled to summary judgment on Short's claim in Count 7 for violation of the Montana Consumer Protection Act because PEC has not made false representations regarding Short's rights under the easements.  (*Id.* at 23-34.)

Arthun also moves for summary judgment on Counts 1, 2, and 3.  (Doc. 43.) Arthun argues that by the 2008 Easement's plain language, Short does not have the right to connect to the electrical line on the Arthun property.  (Doc. 44 at 3.)  In addition, Arthun asserts that the 1956 Easement's plain language does not allow PEC to extend the electrical line on the Arthun property to Short without an additional easement from Arthun.  (*Id.*)  Last, Arthun contends it has not obstructed, interfered, or breached the easements because Short does not have the rights claimed under the easements.  (*Id.*)

---

[2] While PEC contends it is entitled to summary judgment on Count 1 because the claim was pled against Arthun alone, PEC shares Arthun's interpretation of the 2008 Easement.  (Doc. 40 at 9-10.)

Short opposes PEC's and Arthun's motions for summary judgment and moves for partial summary judgment.  (Docs. 45, 53, 55.)  Short contends that because the 1956 and 2008 Easements grant PEC and Short the right, respectively, to connect to the electrical lines on the Arthun property and extend the line to Short's property, it is entitled to summary judgment on Counts 1 and 2.  (Doc. 45 at 2.)

The Court will address each of these issues in turn.

## A.    Count 1 – Declaratory Judgment as to the 2008 Easement

Because the Court's jurisdiction over this action is based on diversity of citizenship, the Court must apply Montana substantive law.  *Med. Lab. Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).  In Montana, "the breadth and scope of an easement are determined upon the actual terms of the grant."  *Mularoni v. Bing*, 34 P.3d 497, 504 (Mont. 2001) (citing Mont. Code Ann. § 70-17-106(1)) ("[T]he extent of a servitude is determined by the terms of the grant.").  The interpretation of a written easement is governed by contract principles.  *Id.*, 34 P.3d at 503.

The interpretation of a contract is a question of law.  *Id.*, 34 P.3d at 503-04.  Contract provisions are interpreted "according to their plain, ordinary meaning."  *Ophus v. Fritz*, 11 P.3d 1192, 1196 (Mont. 2000).  Whether a contract is ambiguous is also a question of law.  *Mary J. Baker Revocable Trust v. Cenex*

9

*Harvest States, Coop., Inc.*, 164 P.3d 851, 857 (Mont. 2007).  If a contract is unambiguous, a court must apply the contract as written.  *Id.*  "An ambiguity exists, however, when the wording of the contract is reasonably subject to two different interpretations." *Ophus*, 11 P.3d at 1196.

Whether an ambiguity exists is determined on an objective basis.  *Mary J. Baker*, 164 P.3d at 857.  "Where the words are clear, certain, and unambiguous, the language alone controls and there is nothing for the courts to interpret or construe." *Morning Star Enter., Inc. v. R.H. Grover, Inc.*, 805 P.2d 553, 557 (Mont. 1991).

An ambiguity does not arise merely "'by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one interpretation.'" *Mary J. Baker*, 164 P.3d at 857 (quoting 11 Williston on Contracts § 30:4, 51-54 (4th ed. 1999)).  *See also Heggem v. Capitol Indem. Corp.*, 154 P.3d 1189, 1195 (Mont. 2007) ("[A] mere disagreement over the meaning of an insurance provision does not render the provision ambiguous.").  Thus, "[t]he intention of the parties must be ascertained, first and foremost from the writing alone." *Morning Star*, 805 P.2d at 557.  While extrinsic evidence may not be used to contradict the terms of the contract, evidence relating to the circumstances of the contract may be considered.  *Mary J. Baker*, 164 P.3d at 857 (citing Mont. Code

10

Ann. § 28-3-402) ("A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates.").

Here, the 2008 Easement grants "a perpetual non-exclusive roadway easement for ingress and egress, thirty (30) feet in width" and is described as follows:

> This easement shall extend fifteen (15) feet on either side of the centerline of the existing roadway which commences at the point of termination of the Anderson Road #45B in Park County, Montana, in the N½N½ of Section 21, Township 5 North, Range 9 East, M.P.M.; then northerly a distance of approximately 175 yards to the North section line of said Section 21 at which point this easement will connect with the road right-of-way being granted by the Montana Department of State Lands through Section 16, Township 5 North, Range 9 East.

(Doc. 26-4 at 1.)

The 2008 Easement further describes the grant to be "for purposes ordinarily and reasonably associated with ownership and use," and provides a non-exclusive list of examples that the roadway may be used for, such as traffic due to: the transportation of livestock, timber, or machinery; agricultural or recreational activities; or the existence of a residence.  (Doc. 26-4 at 1-2).  In addition, the easement allows for "the installation of utility lines and cables, (it being understood and agreed that any utility line or cable installed outside the above easement description must have the written approval of the Arthun Ranch, Inc.)." (*Id.* at 2.)

Therefore, the plain language of the 2008 Easement unambiguously allows for the installation of utility lines and cables within the easement description. The only dispute is the location of the easement.

As noted above, the Anderson Road runs north and south across Arthun's property and reaches a fork or Y-shaped intersection south of the state section. (*See* Doc. 1-1.) One branch of the "Y" continues north on Arthun's property for approximately 175 yards where it connects with the state section; the other branch diverts west to the Arthun residence and outbuildings. (*Id.*; Docs. 46 at ¶ 10; 54 at ¶ 10.)

Arthun and PEC maintain that the easement describes the northerly branch, which was the roadway the Brights, Short's predecessors, used to access their property. (Docs. 40 at 20-21; 44 at 7; 46 at ¶ 12; 54 at ¶ 12.)

Short maintains, however, that the easement contains "two distinct portions." (Doc. 48 at 24, 27.) According to Short, the first portion of the easement, referencing the "existing roadway," refers to Arthun's driveway, or the "Y's" westward branch. (*Id.* at 25-27.) Short asserts that the second portion of the easement description, after the semicolon, refers to the northerly branch. (*Id.* at 25.) Thus, based on Short's reading, the existing power pole, located near the Arthun residence (*see* Doc. 47-4), is within the scope of the "first portion" of the

12

easement, and grants Short the right to connect to the electrical line on Arthun's property.[3]

To arrive at this construction, Short argues the 2008 Easement can only be interpreted as referring to the northerly branch alone by "ignoring significant portions" of the easement.  (Doc. 48 at 23.)  Specifically, Short claims that Arthun's interpretation is plausible only by removing "existing roadway," the semicolon, and "then" from the easement description and "merging the two portions" of the easement together.  (*Id.* at 25-26.)  Citing Merriam-Webster's Dictionary, Short asserts that the easement cannot refer to a single segment because "then" means "being next in a series."  (*Id.* at 26.)

In further support of this contention, and throughout briefing, Short repeatedly cites to a portion Les Arthun's deposition in which he described the end of Anderson Road as being located either at the fork of the "Y," or at a point on the westward branch where the road enters the Arthun Ranch residence and outbuilding compound (*see* Docs. 42-9; 47-1 at 40:2-8[4]).  (Doc. 48 at 22, 24, 26.) While Short frequently cites to this portion of Les Arthun's deposition as evidence

_____

[3] Arthun and Short disagree about the power pole's distance from the center of the roadway but based on the Court's interpretation of the 2008 Easement, this distance is immaterial.  (Docs. 44 at 10-11; 48 at 22.)

[4] During his deposition, Les Arthun was asked: "Q: Do [your wife and sons] share your opinion about where Anderson Road ends?  A: Yes, they do.  Q: And they agree that they think it ends as where we've marked as point Y on Exhibit 24?  A: Y or F, yeah, I think that's in debate; it's one of those."  (*See* Doc. 42-9.)

that the easement refers to two roadways, Short also consistently contends that the exact location of the end of Anderson Road is immaterial.  (Docs. 48 at 22, fn. 2, 24, fn. 3; 53 at 10.)  What is determinative, according to Short, is "the existing roadway" refers to the westward branch leading to the Arthun residence.

The Court rejects Short's strained interpretation of the 2008 Easement and agrees with Arthun's interpretation of the easement language.  Arthun asserts that the 2008 Easement unambiguously describes the "Y's" north branch, which leads to the state section.  (Doc. 44 at 7.)  Again, the grant describes a thirty-foot wide roadway easement at the "existing roadway which commences at the point of termination of the Anderson Road . . . then northerly a distance of approximately 175 yards to the North section line . . . at which point this easement will connect with the road right-of-way being granted by the Montana Department of State Lands."  (Doc. 26-4 at 1.)

The easement's description is unambiguous.  The easement begins at the "existing roadway" where Anderson Road terminates.  (*Id.*)  The grant provides that the easement is thirty feet wide, extending fifteen feet on either side of the center of the road, and runs approximately 175 yards in length until it connects with the state section.  (*Id.*)  Contrary to Short's assertion, this reading does not ignore any of the easement language.  The language describes the location of the easement from its point of origin (the terminus of the Anderson Road) to its end

point (the state section), and further defines the scope of the easement in width and length.  Thus, the 2008 Easement unambiguously describes the north branch of the "Y," that runs a distance of 175 yards from the Y intersection at the end of the Anderson Road, to the state section and onward to Short's property.

Additionally, while the location of the easement is unambiguously described by the writing alone, Arthun's interpretation of the easement is also consistent with the circumstances under which the easement was made and the purpose for which it was granted.  The Brights requested an easement from Arthun to establish legal access to their property in anticipation of the sale of their property.  They did not require an easement to access the Arthun residence and ranch buildings. Therefore, the surrounding circumstances and purpose of the easement supports the conclusion that the easement refers to the existing roadway used by the Brights to access their property, the north branch, not the westward branch that leads to Arthun's residence.

In sum, the 2008 Easement does not allow Short access to the utility line on Arthun's property, and therefore, Arthun is entitled to summary judgment as to Count 1.  To the extent Count 1 is also asserted against PEC, it is entitled to summary judgment on the same grounds.

/ / /

/ / /

**B.** **Count 2 – Declaratory Judgment as to the 1956 Easement**

Short also contends the 1956 Easement grants PEC the right to access the
Arthun property to install utility lines from the existing distribution line.  Arthun
and PEC argue that the 1956 Easement is fixed to the existing power line which
supplies Arthun, and PEC does not have the right to extend the line beyond its
historical location and scope.

"[T]he extent of a servitude is determined by the terms of the grant or the
nature of the enjoyment by which it was acquired."  Mont. Code Ann. § 70-17-
106(1).  The scope of an easement may be general or specific.  "Where an
easement is specific in nature, the breadth and scope of the easement are strictly
determined by the actual terms of the grant."  *Mason v. Garrison*, 998 P.2d 531,
535 (Mont. 2000).  Thus, an easement with specific terms "'is decisive of the limits
of the easement.'"  *Id.* (quoting *Titeca v. State ex rel. Dep't of Fish, Wildlife, and
Parks*, 634 P.2d 1156, 1159 (Mont. 1981)).

Conversely, an easement with general terms requires courts to "look beyond
the plain language of the grant in defining the scope and breadth of the servitude."
*Guthrie v. Hardy*, 28 P.3d 467, 475 (Mont. 2001).  *See also Ganoung v. Stiles*, 398
P.3d 282, 287 (Mont. 2017) ("We rely on historical use to determine the location
of an express easement when the grant fails to adequately define the location and
scope.").  In addition, the Montana Supreme Court has consistently held that "no

16

use may be made of the right-of-way different from the use established at the time of the creation of the easement so as to burden the servient estate to a greater extent than was contemplated at the time the easement was created." *Leffingwell Ranch, Inc. v. Cieri*, 916 P.2d 751, 757 (Mont. 1996) (quoting *Lindley v. Maggert*, 645 P.2d 430, 432 (Mont. 1982)).

Here, the parties dispute both the location and scope of the 1956 easement. As to location, Arthun's predecessor-in-interest granted PEC the right to enter Arthun's property "to place, construct, operate, repair, maintain, relocate and replace . . . an electric transmission or distribution line or system." (Doc. 26-1.) Thus, the grant refers generally to Arthun's lands and does not provide a more specific location.

Nevertheless, Short argues that the 1956 Easement is specific in nature, explicitly allows PEC access to the entirety of the Arthun property, and so, allows PEC to extend electrical service to Short's property. (Doc. 55 at 12, 15, 18.) PEC and Arthun maintain that because the easement was described in general terms, it has become fixed by its existing use and location, and does not allow PEC to extend service to Short. (Docs. 40 at 14-16; 44 at 11.)

The Court agrees with PEC and Arthun's interpretation, which draws support from analogous Montana Supreme Court decisions. In *Anderson v. Stokes*, 163 P.3d 1273, 1276-77 (Mont. 2007), for example, an easement was granted to

the owner of a radio station in 1949 for "the perpetual right and easement to construct, erect, operate and maintain radio towers, guy wires and ground and feed wires and conduits in, upon, over and through" a 160-acre parcel of land in Flathead County, Montana.  Pursuant to the grant, two towers with corresponding ground antennas were built and maintained on the property.  *Id.*, 163 P.3d at 1277. Fifty years later, in 2000, a new owner purchased the radio station, and informed the landowner that the station intended to enlarge or relocate the radio towers.  *Id.* The landowner objected, asserting that the easement only covered the portion of land selected in the early 1950s for the towers.  *Id.*  The station owner maintained that the easement covered the entire 160 acres.  *Id.*

Though the easement described the entire 160-acre property, the Montana Supreme Court determined that because the easement provided that the towers would be built on "certain portions" of the land, it was clear the grant did not encumber the entire property.  *Id.*, 163 P.3d at 1284.  Then, in determining the extent of the easement created, the Montana Supreme Court quoted with approval from its decision in *Strahan v. Bush*, 773 P.2d 718, 720 (Mont. 1989), and explained:

> If the easement is not specifically defined, it need only be such as is reasonably necessary and convenient for the purpose for which it was created.  It is sometimes held . . . where the grant or reservation of an easement is general in its terms, that an exercise of the right, with the acquiescence and consent of both parties, in a particular course or manner, fixes the right and limits it to that particular course or manner.

18

*Id.*, 163 P.3d at 1284-85.  Further, where granting terms are ambiguous, or described generally, what is reasonable is "determined in light of the situation of the property and the surrounding circumstances." *Id.*, 163 P.3d at 1285.

Applying these principles to the situation in *Anderson v. Stokes*, the Montana Supreme Court found the easement was limited in size to the historical location of the two radio towers originally placed on the property.  *Id.*  In making this determination, the court pointed to several factors which established its historical use, including that the original grantee of the easement selected the area to construct the towers and then built the towers at that location; the grantors of the easement acquiesced in or consented to the location selected; the towers then remained at that location for over 50 years; and the location selected was all that was necessary for the purpose for which the easement was created.  *Id.*, 163 P.3d at 1285-86.

The same is true here.  PEC selected the location of the utility line and associated improvements and constructed the line at that location; Arthun's predecessor consented to the selection and the placement of the line; the utility line has existed at that same location for over 60 years; and the location selected was all that was "reasonably necessary and convenient for the purpose for which [the easement] was created." *Strahan*, 773 P.2d at 720.

19

Short argues, however, that the easement in *Anderson* is distinguishable because, as the Montana Supreme Court noted, the *Anderson* easement did not contain any language granting the right of relocation.  (*Id.*, 163 P.3d at 1286; Doc. 53 at 25.)  Short points out that the 1956 Easement contains the granting language "construct, . . . relocate and replace."  (Docs. 48 at 18; 53 at 25.)  But whether the easement grants PEC the right to relocate the Arthun line is immaterial here.  It was relevant in *Anderson*, because that is what the radio station proposed to do—enlarge or relocate the radio towers.  In this case, Short is not asking PEC to relocate the existing line; it is demanding a new, additional line to run from the Arthun residence, north to the state section.

More importantly, however, these terms cannot be considered in isolation. *See Anderson*, 163 P.3d at 1283-84 ("Mere isolated tracts, clauses and words will not be allowed to prevail over the general language utilized in the instrument.") (quoting *Rumph v. Dale Edwards, Inc.*, 600 P.2d 163, 168 (Mont. 1979)); Mont. Code Ann. § 28-3-202 ("The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other.").

Contrary to Short's assertion, there is no express language in the 1956 Easement that can be construed as granting PEC the right to extend electrical service from Arthun's property to neighboring properties.  Instead, when read in its

20

entirety, the easement contemplates the effect of electrical service to the Arthun

property and the placement of "an electric transmission or distribution line or

system," and limits the installation "at pole location, [to] only a single pole and

appurtenances . . . [and] that the location of the poles will be such as to form the

least possible interference to farm operations." (Doc. 26-1.) The parties plainly

contemplated the installation of a single line or system to supply electricity to the

Arthun property in a manner which was the least intrusive to Arthun's farming

operation. There is no evidence they contemplated the Arthun property to become

a conduit for electrical services to other properties in the area. Therefore, the 1956

Easement is limited in size to its historic location.

As to the scope of the grant, the Court finds the 1956 Easement is also

written in general terms. The Montana Supreme Court's decision in *Quarter

Circle JP Ranch, LLC v. Jerde*, 414 P.3d 1277 (Mont. 2018), is instructive on this

issue. In *Jerde*, several landowners granted access to each other as "Grantors-

Grantees" on an existing trail or roadway "for the purpose of conducting farming

and ranching operations and activities." *Id.*, 414 P.3d at 1279. Jerde, as a

successor-in-interest to one of the landowners, moved a fifth-wheel trailer on the

property for use as a residence. *Id.*

An action was filed seeking declaratory relief regarding Jerde's use of the

easement, including whether Jerde's use of the easement for residential purposes

21

was contemplated by the easement.  *Id.*  The district court found the easement was specific in nature and "clear and unambiguous as to its scope," and that it included residential use.  *Id.*, 414 P.3d at 1280.

The Montana Supreme Court disagreed, emphasizing that "'in the absence of clear specifications defining scope, no use may be made of a right-of-way different from the use established at the time of the creation of the easement so as to burden the servient estate to a greater extent than was contemplated at the time the easement was created.'"  *Id.*, 414 P.3d at 1282 (quoting *Guthrie*, 28 P.3d at 475).  The court found the easement in *Jerde* did not contain language expressly indicating that the parties intended the existing road to support residential use.  *Id.*  Therefore, use of the existing road "for residential purposes is not strictly determined by the actual terms of the grant, [and thus] the easement is not 'specific' for purposes of this particular question."  *Id.*  (internal quotations and citations omitted).

Similar here, the language granting PEC the right "to place, construct . . . relocate and replace . . . an electric transmission or distribution line or system" is not further expanded to include or exclude extension of electrical service to neighboring properties.  With respect to this issue, then, the easement is general in nature, and requires the Court to look beyond the easement's plain language and consider "the situation of the property, surrounding circumstances, and historical

use to define the breadth and scope" of the 1956 Easement.  *Ganoung*, 398 P.3d at 286.

An analysis of these factors does not support Short's interpretation of the 1956 Easement.  In *Leffingwell Ranch*, for example, the Montana Supreme Court looked to the historical use of roadway easements that were granted in 1927 for "ingress and egress" to determine the scope of the easement.  916 P.2d at 756.  At the time the easements were granted, the roadway was used only to access two to three homesteads for related agricultural purposes.  *Id.*, 916 P.2d at 757.  Then, in 1993, the dominant estate holder sought to divide the property into 174 individual parcels for development.  *Id.*, 916 P.2d at 752, 757.  The court held that this proposed use "was not contemplated by the original parties to the easements, would be inconsistent with the historical use of the easements, and would constitute an improper burdening of those easements" because it was clear the easements did not contemplate, or intend, this enlargement or increase in traffic. *Id.*, 916 P.2d at 757-58.

While the proposed expansion of the use of the 1956 Easement is not as great as that in *Leffingwell Ranch*, the same analysis is applicable to the surrounding circumstances and historical use of the easement.  There is no evidence to indicate that at the time the easement was granted the parties contemplated extending electrical service to neighboring properties.  The property

23

was situated south of the undeveloped state section and, before Short purchased his property in 2015, undeveloped agricultural lands.  The easement was granted for the purpose of providing electricity to Arthun.  Then, from 1956 to 2015, the scope of the easement remained unchanged and was limited to providing electricity to the Arthun property.  (Docs. 40 at 14-16; 44 at 15.)  The parties agree there is no evidence that the location of the Arthun electrical line has ever moved or that other changes have been made other than routine maintenance.  (Docs. 46 at ¶ 33; 54 at ¶ 33.)

Therefore, reading the 1956 Easement to allow for the extension of an additional electrical line would add language to the easement, be inconsistent with the historical use of the easement, and would burden Arthun "to a greater extent than was contemplated at the time" the 1956 Easement was created.  *Leffingwell Ranch*, 916 P.2d at 757 (quoting *Lindley*, 645 P.2d at 432).  Thus, Short's assertion that PEC can extend the electrical line on the Arthun property is not supported by the easement's express terms or its historic use.

Short also argues, however, that in addition to the 1956 Easement, PEC can extend the electrical line to Short pursuant to Arthun's "membership agreement" with PEC.  (Doc. 48 at 5-6.)  Short claims that "the Court need not, and should not, look beyond the plain language" of the 1956 Easement, but maintains that the membership agreement also supports its position because the agreement allows

24

PEC to access easements "when necessary. . . to provide service to neighboring properties owned by third parties." (Docs. 47-3; 55 at 20.)  Short repeatedly quotes and cites this agreement interchangeably with the 1956 Easement.  (*See* Docs. 48 at 19; 53 at 20, 27; 55 at 21.)

Short has not shown that the membership agreement has any relevance to the 1956 Easement.  The membership agreement cited by Short was entered in 2013 for service at an address at "122 Queen Lane."  (Doc. 47-3.)  This is not the address of the Arthun property at issue in this matter.  (Docs. 54 at ¶ 4; 58 at ¶ 19.)  In fact, it pertains to a different property owned by Arthun that, according to Arthun, is located approximately 23 miles south of the property at issue.  (Doc. 58 at ¶ 19.)  Short does not acknowledge that the membership agreement pertains to an entirely different property until its reply brief, where it is asserted that this agreement "relates to <u>all</u> of Arthun's property without limitation to any particular parcel or service location."  (Doc. 61 at 7.)  Short provides no additional argument or support for this assertion, and thus, the Court finds this argument misleading and unavailing.  The 2013 membership agreement for the provision of electrical service to an entirely separate property has no relevance to an easement created 57 years prior its execution.

Last, Short asserts PEC "is obligated to extend service from" the Arthun property to Short because of its status as a cooperative.  (Doc. 48 at 34.)  While it

is true that a cooperative "holds a favored position in the law," and must deal with its members in a reasonable manner, Short's argument is unpersuasive. *Howe v. Big Horn Elec. Coop., Inc.*, 670 P.2d 936, 937-38 (Mont. 1983). In *Howe*, the Montana Supreme Court determined that it was unreasonable for a cooperative to require a prospective member to pay a delinquent member's bill or face termination of service. 670 P.2d at 938. Likewise, in *Granbois v. Big Horn Elec. Coop., Inc.*, 986 P.2d 1097, 1101-02 (Mont. 1999), the Court held it was unreasonable to make transfer of membership contingent on the new member paying a delinquent bill in full. Here, unlike in *Howe* and *Granbois*, PEC is not conditioning its services unreasonably. Instead, Short has demanded that PEC extend service from the Arthun property, a right PEC does not have. Because the Court has determined that the 1956 Easement does not allow PEC to extend service to Short, it cannot find that service was unreasonably denied. Accordingly, PEC and Arthun are entitled to summary judgment as to Count 2.

## C.    Count 3 – Obstruction of, Interference with, and Breach of Easement

In Count 3, Short contends that PEC and Arthun have "wrongfully prevented [Short] from exercising [Short's] right to install or connect to utility lines running from" Arthun's property under the 1956 and 2008 Easements. (Doc. 1 at ¶ 50.) To establish interference with an easement right, however, the alleged rights must actually exist. *Stokes v. State ex. rel. Mont. Dep't of Transp.*, 162 P.3d 865, 868

26

(Mont. 2007).  *See also Grenfell v. Anderson*, 56 P.3d 326, 403-04 (Mont. 2002) (holding that a prima face case of tortious interference with a contract was not established where the contract had been terminated prior to the alleged interference).  Here, the Court has determined that Short does not have the right to install or connect to the utility line on Arthun's property, and thus, Short has failed to establish interference with rights under either the 1956 or 2008 Easements.  PEC and Arthun are, therefore, entitled to summary judgment as to Count 3.

### D.     Count 7 – Violation of the Montana Consumer Protection Act

The Montana Consumer Protection Act ("MCPA") makes unlawful unfair or deceptive acts or practices in the conduct of any trade or commerce and creates a private cause of action for violations.  Mont. Code Ann. §§ 30-14-103 and -133; *Plath v. Schonrock*, 64 P.3d 984, 989 (Mont. 2003).  Actions brought against electric cooperatives are not exempt from the Consumer Protection Act.  *Granbois*, 986 P.2d at 102; Mont. Code Ann. § 30-14-105(1).

Short alleges that PEC falsely represented that it does not have an easement to extend electric service to Short from the Arthun property, and that these statements were made "in order to deceive [Short] and thereby coerce [Short] into constructing" a new line at Short's expense to benefit PEC and Arthun.  (Doc. 1 at ¶¶ 78, 81-82.)  Later, in briefing, Short contends that he is "not claiming that PEC's false statements are actionable on their own," but that PEC's "coercive

27

conduct in requiring Short to construct an unnecessary, expensive and redundant electrical line" is actionable under the MCPA.  (Doc. 55 at 32.)

PEC did not make any false representations to Short.  "[I]n order for a representation to be actionable under the MCPA, it must have been *untrue when made*."  *WLW Realty Partners, LLC v. Cont'l Partners VIII, LLC*, 360 P.3d 1112, 1118 (Mont. 2015) (emphasis in original).

Here, PEC employee, Matt Grose, spoke with Short, or its representative, regarding electrical service to the Short property.  (Docs. 41 at ¶ 12; 56 at ¶ 12; 46-13 at 16:2-10.)  Grose told Short that he believed there were two options by which PEC could provide electrical service, either by: (1) obtaining an easement from Arthun to connect to the line on the Arthun property; or (2) installing electrical lines along Anderson Road pursuant to the 2008 Easement.  (Doc. 46-13 at 16:15-17:3.)  In addition, Grose had two discussions with Les Arthun in which Les said he would not provide an easement to extend the electrical line on his property.  (Docs. 41 at ¶ 13; 56 at ¶ 13.)  PEC simply explained its understanding of PEC's rights under the 1956 Easement.  As determined above, PEC has not "refused to exercise its rights" under the 1956 Easement because PEC does not have the right to extend service to Short under the easement.  (Doc. 55 at 27.)

In addition, there is no evidence that PEC has attempted to coerce Short into building a new line for its benefit.  "[A]n unfair act or practice is one which

28

offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Rohrer v. Knudson*, 203 P.3d 759, 764 (Mont. 2009). Short has alleged that PEC is motivated to require Short to build a line along Anderson Road to "reduce PEC's maintenance costs and benefit Arthun by removing the lines from Arthun's field." (Doc. 55 at 29.) Other than its own speculation, however, Short has failed to provide any evidence to create an issue of fact to support this assertion. The Court therefore finds that PEC is entitled to summary judgment as to Count 7.

## IV.  Conclusion

Based on the foregoing, **IT IS HEREBY ORDERED** as follows:

1.  PEC's Motion for Summary Judgment (Doc. 39) is **GRANTED**.

2.  Arthun's Motion for Summary Judgment (Doc. 43) is **GRANTED**.

3.  Short's Motion for Partial Summary Judgment (Doc. 45) is **DENIED**.

4.  The Clerk of Court is directed to enter judgment accordingly.

**IT IS ORDERED**.

DATED this 29th day of December, 2021.

TIMOTHY J. CAVAN
United States Magistrate Judge